RECEIPT # _63834_
AMOUNT $ _____
SUMMONS ISSUED_____
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK._____
DATE _____

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| CURAGEN CORPORATION | ) ) ) |
| Defendant. | ) ) |

**COMPLAINT**

# 5 - 10860 WGY

**MAGISTRATE JUDGE** _____

## PARTIES

1.  Plaintiff Massachusetts Institute of Technology ("MIT") is a Massachusetts not for profit corporation located at 77 Massachusetts Avenue, Cambridge, MA 02139-4307.

2.  Defendant CuraGen Corporation ("CuraGen") is a Delaware corporation having its principal place of business at 555 Long Wharf Drive, New Haven, CT 06511.

## JURISDICTION AND VENUE

3.  This Court has original diversity jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and is between citizens of different states.

4.  The Court has personal jurisdiction over CuraGen pursuant to M.G.L. c. 223A, §3.

5.  Venue is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to this action occurred in Massachusetts.

## FACTS

6.     On or about November 12, 1997, MIT and CuraGen entered into an exclusive patent license agreement under which MIT, as owner of certain patent rights, granted a license to CuraGen in exchange for certain payment obligations and other commitments by CuraGen (the "Contract"). A copy of the Contract is attached hereto at Exhibit A.

7.     On or about April 12, 1999, the U.S. Patent and Trademark Office allowed the first claim of the U.S. patent application listed in Appendix A of the Contract and licensed to CuraGen under the Contract.

8.     As a consequence of the allowance of the first claim and pursuant to section 4.1(c) of the Contract, CuraGen became contractually obligated to pay MIT a Patent Issuance Fee of $75,000 within thirty (30) days of April 12, 1999.

9.     On January 1, 2000, a License Maintenance Fee of $25,000 became due under the Contract, pursuant to section 4.1(b)(ii).

10.    The Contract provides, at Section 6.2, that CuraGen shall be responsible for all fees and costs relating to the filing, prosecution, and maintenance of the patent rights described in the Contract (the "Patent Fees"). The Patent Fees total $2,356.81.

11.    MIT has repeatedly notified CuraGen in writing that the Patent Issuance Fee, the License Maintenance Fee and the Patent Fees (collectively, the "Fees") are due and owing to MIT.

12.    The Contract also provides, in Section 5.4, that overdue payments shall bear interest until payment.

13.     CuraGen failed to make timely payments of the amounts due under the Contract, and by letter dated November 12, 1999, MIT terminated the Contract to be effective 90 days from the letter, on February 10, 2000.

14.     As of the date of filing of this Complaint, CuraGen has not paid MIT the remainder of the Fees totaling $102,356.81.

## CLAIMS

### COUNT I: BREACH OF CONTRACT

15.     MIT realleges and incorporates herein the allegations of paragraphs 1-14 of this Complaint.

16.     Pursuant to Section 13.4, CuraGen is contractually obligated to satisfy all of its obligations that matured prior to the effective date of termination.

17.     CuraGen has failed to pay MIT the Fees, totaling $102,356.81.

18.     CuraGen has also failed to pay MIT interest of $52,993.38 due on the Fees as of March 31, 2005.


**WHEREFORE**, Plaintiff Massachusetts Institute of Technology respectfully requests that the Court enter judgment in its favor for all damages together with interest, costs of collection and attorney's fees as allowed under the Contract or otherwise

3

available and any other relief as this Court deems appropriate.

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY

By its attorney,

Mark C. DiVincenzo, BBO No.: 552818
Richelle Nessralla, BBO No.: 640509
Massachusetts Institute of Technology
77 Massachusetts Avenue
Building 12-090
Cambridge, MA  02139
(617) 452-3985

Dated: April 27, 2005

4

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

and

CURAGEN CORPORATION

PATENT LICENSE AGREEMENT

(EXCLUSIVE)

1/97
Patent Exclusive

IA/jcp
Curagen.Excl.Agmt.11.05.97

## TABLE OF CONTENTS

WITNESSETH ................................................................ 1

1  DEFINITIONS ............................................................ 2

2  GRANT .................................................................. 3

3  DILIGENCE.............................................................. 4

4  ROYALTIES.............................................................. 5

5  REPORTS AND RECORDS .............................................. 7

6  PATENT PROSECUTION ............................................... 8

7  INFRINGEMENT ....................................................... 9

8  PRODUCT LIABILITY .................................................10

9  EXPORT CONTROLS...................................................11

10 NON-USE OF NAMES..................................................11

11 ASSIGNMENT .........................................................12

12 DISPUTE RESOLUTION ...............................................12

13 TERMINATION .......................................................13

14 PAYMENTS, NOTICES AND OTHER COMMUNICATIONS ....14

15 MISCELLANEOUS PROVISIONS......................................15

APPENDIX   A.............................................................16

APPENDIX   B.............................................................17

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

and

CURAGEN CORPORATION

PATENT LICENSE AGREEMENT

This Agreement is made and entered into this _12th_ day of _November_, 199_97_, (the "EFFECTIVE DATE") by and between the MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and having its principal office at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139, U.S.A. (hereinafter referred to as "M.I.T."), and CuraGen Corporation, a corporation duly organized under the laws of Delaware and having its principal office at 555 Long Wharf Drive, New Haven, Connecticut 06511 (hereinafter referred to as "LICENSEE").

## WITNESSETH

WHEREAS, M.I.T. is the owner of certain PATENT RIGHTS (as later defined herein) relating to M.I.T. Case No. 7205, "Yeast Three-Hybrid System", by Jun Liu and Edward Licitra and has the right to grant licenses under said PATENT RIGHTS, subject only to a royalty-free, nonexclusive license heretofore granted to the United States Government;

WHEREAS, M.I.T. and LICENSEE entered into, an Option Agreement, dated August 22, 1997 for an internal use only license, which this License Agreement supersedes;

WHEREAS, M.I.T. desires to have the PATENT RIGHTS developed and commercialized to benefit the public and is willing to grant a license thereunder;

WHEREAS, LICENSEE has represented to M.I.T., to induce M.I.T. to enter into this Agreement, that LICENSEE is experienced in the development and utilization of high-throughput assays for the discovery of novel therapeutic compounds and that it shall commit itself to a thorough, vigorous and diligent program of exploiting the PATENT RIGHTS so that public utilization shall result therefrom; and

WHEREAS, LICENSEE desires to obtain a license under the PATENT RIGHTS upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

## 1 - DEFINITIONS

For the purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1  "LICENSEE" shall include a related company of CURAGEN, the voting stock of which is directly or indirectly at least Fifty Percent (50%) owned or controlled by CURAGEN, and an organization the majority ownership of which is directly or indirectly common to the ownership of CURAGEN.

1.2  "PATENT RIGHTS" shall mean all of the following M.I.T. intellectual property:

    a.    the United States patents listed in Appendix A;

    b.    the United States patent applications listed in Appendix A, and divisionals, continuations and claims of continuation-in-part applications which shall be directed to subject matter specifically described in such patent applications, and the resulting patents;

    c.    any patents resulting from reissues or reexaminations of the United States patents described in (a) and (b) above;

    d.    the Foreign patents listed in Appendix A;

    e.    the Foreign patent applications listed in Appendix A, and divisionals, continuations and claims of continuation-in-part applications which shall be directed to subject matter specifically described in such Foreign patent applications, and the resulting patents;

    f.    Foreign patent applications filed after the EFFECTIVE DATE in the countries listed in Appendix B and divisionals, continuations and claims of continuation-in-part applications which shall be directed to subject matter specifically described in such patent applications, and the resulting patents; and

    g.    any Foreign patents, resulting from equivalent Foreign procedures to United States reissues and reexaminations, of the Foreign patents described in (d), (e) and (f) above.

1.3  A "LICENSED PRODUCT" shall mean any product or part thereof which:

    a.    is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the PATENT RIGHTS in the country in which any such product or part thereof is made, used or sold; or

    b.    is manufactured by using a process or is employed to practice a process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the PATENT RIGHTS in the country in which any LICENSED PROCESS is used or in which such product or part thereof is used or sold.

1.4  A "LICENSED PROCESS" shall mean any process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the PATENT RIGHTS.

-2-

1.5 "IDENTIFIED PRODUCT" shall mean any product, or derivative thereof, which was identified or selected through the use of the LICENSED PROCESS.

1.6 "NET SALES" shall mean LICENSEE's billings for LICENSED PRODUCTS, LICENSED PROCESSES and IDENTIFIED PRODUCTS less the sum of the following:

    a.    discounts allowed in amounts customary in the trade for quantity purchases, cash payments, prompt payments, wholesalers and distributors;

    b.    sales, tariff duties and/or use taxes directly imposed and with reference to particular sales;

    c.    outbound transportation prepaid or allowed; and

    d.    amounts allowed or credited on returns.

No deductions shall be made for commissions paid to individuals whether they be with independent sales agencies or regularly employed by LICENSEE and on its payroll, or for cost of collections. NET SALES shall occur when a LICENSED PRODUCT, LICENSED PROCESS, or IDENTIFIED PRODUCT shall be invoiced. If a LICENSED PRODUCT, LICENSED PROCESS, or IDENTIFIED PRODUCT shall be distributed or invoiced for a discounted price substantially lower than customary in the trade or distributed at no cost to affiliates or otherwise, NET SALES shall be based on the customary amount billed for such LICENSED PRODUCTS, LICENSED PROCESSES, or IDENTIFIED PRODUCT.

1.7 "TERRITORY" shall mean worldwide.

1.8 "FIELD OF USE A" shall mean screening for drug compounds using receptors.

1.9 "FIELD OF USE B" shall mean identification and isolation of receptors using known drug compounds.

## 2 - GRANT

2.1 M.I.T. hereby grants to LICENSEE the exclusive right and license in the TERRITORY for FIELD OF USE A to practice under the PATENT RIGHTS and, to the extent not prohibited by other patents, to make, have made on its behalf, use, have used on its behalf, lease, have leased on its behalf, sell, have sold on its behalf, import, and have imported on its behalf, LICENSED PRODUCTS and to practice and have practiced on its behalf, the LICENSED PROCESSES subject to the royalty-free, nonexclusive license rights of the United States Government per FAR 52.227-11, and subject to the two (2) non-exclusive internal use licenses granted prior to the EFFECTIVE DATE until the expiration of the last to expire of the PATENT RIGHTS, unless this Agreement shall be sooner terminated according to the terms hereof.

2.2 M.I.T. hereby grants to LICENSEE the nonexclusive right and license in the TERRITORY for FIELD OF USE B to practice under the PATENT RIGHTS and, to the extent not

prohibited by other patents, to make, have made on its behalf, use, have used on its behalf, lease, have leased on its behalf, sell, have sold on its behalf, import, and have imported on its behalf, LICENSED PRODUCTS and to practice and have practiced on its behalf the LICENSED PROCESSES, until the expiration of the last to expire of the PATENT RIGHTS, unless this Agreement shall be sooner terminated according to the terms hereof.

2.3  LICENSEE agrees that LICENSED PRODUCTS leased or sold in the United States shall be manufactured substantially in the United States.

2.4  M.I.T. reserves the right to practice under the PATENT RIGHTS for noncommercial research purposes.

2.5  LICENSEE shall have the right to enter into sublicensing agreements for the rights, privileges and licenses granted hereunder  in FIELD OF USE A.  Upon any termination of this Agreement, sublicensees' rights shall also terminate, subject to Paragraph 13.6 hereof.

2.6  LICENSEE agrees to incorporate terms and conditions substantively similar to Articles 2, 5.1, 7.1, 7.2, 7.3, 7.5, 7.6, 8, 9, 10, 12 and 15 of this Agreement into its sublicense agreements, that are sufficient to enable LICENSEE to comply with this Agreement.

2.7  LICENSEE agrees to forward to M.I.T. a copy of any and all sublicense agreements promptly upon execution by the parties.

2.8  LICENSEE shall not receive from sublicensees anything of value in lieu of cash payments in consideration for any sublicense under this Agreement, without the express prior written permission of M.I.T.

2.9  M.I.T. also grants to LICENSEE a six (6) month first option, dated from the time M.I.T. notifies LICENSEE of a new patent application, to add to the PATENT RIGHTS of this Agreement any future patents which arise under the sponsored research program described in 3.2 (b) below, to this Agreement, for a License Issue Fee to be negotiated, but not to exceed Twenty-Five Thousand Dollars ($25,000) per patent application, and reimbursement of all patent costs.

2.10  Nothing in this Agreement shall be construed to confer any rights upon LICENSEE by implication, estoppel or otherwise as to any technology or patent rights of M.I.T. or any other entity other than the PATENT RIGHTS, regardless of whether such patent rights shall be dominant or subordinate to any PATENT RIGHTS.

### 3 - DILIGENCE

3.1  LICENSEE shall use its best efforts to bring one or more LICENSED PRODUCTS or LICENSED PROCESSES or IDENTIFIED PRODUCTS to market through a thorough, vigorous and diligent program for exploitation of the PATENT RIGHTS and to continue active, diligent marketing efforts for one or more LICENSED PRODUCTS or LICENSED PROCESSES or IDENTIFIED PRODUCTS throughout the life of this Agreement.

3.2  In addition, LICENSEE shall adhere to the following milestones:

a.   LICENSEE shall deliver to M.I.T. on or before January 15, 1998 a business plan showing the amount of money, number and kind of personnel and time budgeted and planned for each phase of development of the LICENSED PRODUCTS and LICENSED PROCESSES and shall provide similar reports to M.I.T. on or before January 15 of each year.

b.   LICENSEE shall sponsor research in Professor Jun Liu's laboratory at M.I.T. at a minimum level of two (2) post-doctoral fellows for two (2) consecutive years beginning on or before June 1, 1998.

c.   LICENSEE shall commit a minimum of ten (10) full-time equivalent (FTE) employees per year to the development of the LICENSED PROCESS beginning on or before the first anniversary of the EFFECTIVE DATE of this Agreement.

d.   LICENSEE will begin to use the LICENSED PROCESS commercially within one (1) year of the date that it is shown by LICENSEE, or Professor Jun Liu, that the three-hybrid screening system can be used to screen for drugs using a receptor.  Such commercial use shall mean either execution of a strategic partnership, collaboration, or sublicense agreement which encompasses use of the LICENSED PROCESS and totals a minimum of Five Hundred Thousand Dollars ($500,000) per year.

e.   If, at any time during the term of this Agreement, LICENSEE's liquid assets fall below Five Hundred Thousand Dollars ($500,000) this Agreement will become non-exclusive in FIELD OF USE A.

f.   LICENSEE will provide certified financial statements to M.I.T. on a semi-annual basis which include, at a minimum, a balance sheet and an income statement.

3.3  LICENSEE's failure to perform in accordance with either Paragraph 3.1 or 3.2 above shall be grounds for M.I.T. to terminate this Agreement pursuant to Paragraph 13.3 hereof.

## 4 - ROYALTIES

4.1  For the rights, privileges and license granted hereunder, LICENSEE shall pay royalties to M.I.T. in the manner hereinafter provided to the end of the term of the PATENT RIGHTS or until this Agreement shall be terminated:

a.   License Issue Fee of Fifty Thousand Dollars ($50,000), which said License Issue Fee shall be deemed earned and due immediately upon the EFFECTIVE DATE.

b.   License Maintenance Fees of

(i).   Fifteen Thousand Dollars ($15,000) per year payable on January 1, 1999 and on January 1 of each year thereafter until the first claim of the PATENT RIGHTS is allowed; and

(ii)   License Maintenance Fees of Twenty-Five Thousand Dollars ($25,000) per year payable on January 1 of each year after the first claim of the PATENT RIGHTS is allowed; provided, however, License Maintenance Fees may be credited to Running Royalties subsequently due on NET

SALES for each said year, if any. License Maintenance Fees paid in excess of Running Royalties shall not be creditable to Running Royalties for future years.

c.   Patent Issue Fee of Seventy-Five Thousand Dollars ($75,000) due within thirty (30) days of the allowance of the first claim of the PATENT RIGHTS.

d.   License Milestone Fee of One Hundred Thousand Dollars ($100,000) due upon LICENSEE's first use of the LICENSED PROCESS in a high-throughput screen.

e.   Running Royalties in an amount equal to Three-Tenths of One Percent (0.3%) of NET SALES of IDENTIFIED PRODUCTS used, leased or sold by and/or for LICENSEE; provided however, LICENSEE may, at any time, pay M.I.T. a lump sum payment of Five Million Dollars ($5,000,000) times an adjustment for inflation equal to the ratio of the Consumer Price Index (CPI) at the time of payment to the CPI on the EFFECTIVE date for each IDENTIFIED PRODUCT and after this payment is received by M.I.T., LICENSEE will not have to pay any future Running Royalties due under this Paragraph 4.1 (e) for that particular IDENTIFIED PRODUCT. Any Running Royalties paid under this Paragraph 4.1 (e) may not be credited toward this lump sum payment. This Running Royalty obligation shall be in effect for ten (10) years following the first commercial sale of a regulated product in the U.S., Europe or Japan.

f.   Other Payments in the amount of:

(i)   Three-Percent (3.0%) of research and development funding under strategic partnership funding and collaboration funding received by LICENSEE for the practice of LICENSED PROCESS on behalf of third parties, including, but not limited to, milestone payments; provided, however, such payment shall be capped at One Hundred Thousand Dollars ($100,000) per year. Such payment shall be due on January 1 of each year for the income received by LICENSEE in the preceding year; and

(ii)  One Twentieth (5.0%) of any royalties that LICENSEE receives from third parties on sales of IDENTIFIED PRODUCTS, including milestone payments and Running Royalties. This obligation will be in effect for ten (10) years after the first regulated commercial sale of each IDENTIFIED PRODUCT in the U.S., Europe or Japan.

g.   Running Royalties in an amount equal to Five Percent (5.0%) of NET SALES of LICENSED PRODUCTS and LICENSED PROCESSES, used, leased or sold by and/or for LICENSEE, in the form of three-hybrid screening kits and/or other research materials.

h.   Sublicensing Revenues in an amount equal to Twenty-Five Percent (25%) of any payments, including, but not limited to, sublicense issue fees and running royalties, received from sublicensees in consideration for the LICENSED PRODUCTS and LICENSED PROCESSES.

4.2  All payments due hereunder shall be paid in full, without deduction of taxes or other fees which may be imposed by any government, except as otherwise provided in Paragraph 1.6 (b).

4.3  No multiple royalties shall be payable because any LICENSED PRODUCT, its manufacture, use, lease or sale are or shall be covered by more than one PATENT RIGHTS patent application or PATENT RIGHTS patent licensed under this Agreement.

4.4  Royalty payments shall be paid in United States dollars in Cambridge, Massachusetts, or at such other place as M.I.T. may reasonably designate consistent with the laws and regulations controlling in any foreign country.  If any currency conversion shall be required in connection with the payment of royalties hereunder, such conversion shall be made by using the exchange rate prevailing at the Chase Manhattan Bank (N.A.) on the last business day of the calendar quarterly reporting period to which such royalty payments relate.

## 5 - REPORTS AND RECORDS

5.1  LICENSEE shall keep full, true and accurate books of account containing all particulars that may be necessary for the purpose of showing the amounts payable to M.I.T. hereunder.  Said books of account shall be kept at LICENSEE's principal place of business or the principal place of business of the appropriate division of LICENSEE to which this Agreement relates.  Said books and the supporting data shall be open at all reasonable times for five (5) years following the end of the calendar year to which they pertain, to the inspection of an agent of M.I.T. who is a C.P.A. and who is mutually acceptable to M.I.T. and LICENSEE for the purpose of verifying LICENSEE's royalty statement or compliance in other respects with this Agreement. Should such inspection lead to the discovery of a greater than Ten Percent (10%) discrepancy in reporting to M.I.T.'s detriment, LICENSEE agrees to pay the full cost of such inspection.

5.2  LICENSEE shall deliver to M.I.T. true and accurate reports, giving such particulars of the business conducted by LICENSEE and its sublicensees under this Agreement as shall be pertinent to diligence under Article 3 and royalty accounting hereunder:

    a.    before the first commercial sale of a LICENSED PRODUCT, LICENSED PROCESS or IDENTIFIED PRODUCT, annually, on January 31 of each year; and

    b.    after the first commercial sale of a LICENSED PRODUCT, LICENSED PROCESS or IDENTIFIED PRODUCT, quarterly, within sixty (60) days after March 31, June 30, September 30 and December 31, of each year.

These reports shall include at least the following:

    a.    number of LICENSED PRODUCTS manufactured, leased and sold by and/or for LICENSEE and all sublicensees;

b.  accounting for all LICENSED PROCESSES used or sold by and/or for LICENSEE and all sublicensees;

c.  number of IDENTIFIED PRODUCTS sold by and/or for LICENSEE;

d.  accounting for NET SALES, noting the deductions applicable as provided in Paragraph 1.6;

e.  Running Royalties due under Paragraph 4.1(e), 4.1 (f) ii, and 4.1 (g);

f.  other payments dues under Paragraph 4.1 (f);

g.  royalties due on other payments from sublicensees under paragraph 4.1(h);

h.  total royalties due; and

i.  names and addresses of all sublicensees of LICENSEE.

5.3  With each such report submitted, LICENSEE shall pay to M.I.T. the royalties due and payable under this Agreement. If no royalties shall be due, LICENSEE shall so report.

5.4  The amounts due under Articles 4 and 6 shall, if overdue, bear interest until payment at a per annum rate Two Percent (2.0%) above the prime rate in effect at the Chase Manhattan Bank (N.A.) on the due date. The payment of such interest shall not foreclose M.I.T. from exercising any other rights it may have as a consequence of the lateness of any payment.

## 6 - PATENT PROSECUTION

6.1  M.I.T. shall apply for, seek prompt issuance of, and maintain the PATENT RIGHTS during the term of this Agreement. Appendix B is a list of the foreign countries in which patent applications corresponding to the United States Patent applications listed in Appendix A shall be filed. Appendix B may be amended by mutual agreement of both parties. The filing, prosecution and maintenance of all PATENT RIGHTS applications and patents shall be the primary responsibility of M.I.T.; provided, however, LICENSEE shall have reasonable opportunities to advise M.I.T. and shall cooperate with M.I.T. in such filing, prosecution and maintenance.

6.2  Payment of all fees and costs relating to the filing, prosecution and maintenance of the PATENT RIGHTS shall be the responsibility of LICENSEE, whether such fees and costs were incurred before or after the EFFECTIVE DATE. (As of October 16, 1997, such fees and costs for which M.I.T. has been billed equal approximately Twenty-Five Thousand and Fifty-Nine Dollars ($25,059).) LICENSEE shall pay such fees and costs to M.I.T. within thirty (30) days of invoicing; late payments shall accrue interest and shall be subject to Paragraph 5.4.

## 7 - INFRINGEMENT

7.1  LICENSEE and M.I.T. shall each inform the other promptly in writing of any alleged infringement of the PATENT RIGHTS by any third party that comes to the notifying party's attention and of any available evidence thereof of which the notifying party is aware.

7.2  During the term of this Agreement, LICENSEE shall have the right, but shall not be obligated, to prosecute at its own expense all infringements in FIELD OF USE A of the PATENT RIGHTS and, in furtherance of such right, M.I.T. hereby agrees that LICENSEE may include M.I.T. as a party plaintiff in any such suit, without expense to M.I.T.  The total cost of any such infringement action commenced or defended solely by LICENSEE shall be borne by LICENSEE. No settlement, consent judgment or other voluntary final disposition of the suit may be entered into without the consent of M.I.T., which consent shall not unreasonably be withheld.  LICENSEE shall indemnify M.I.T. against any order for costs that may be made against M.I.T. in such proceedings unless such costs are assessed based on acts, other than the act of entering into this License Agreement, of M.I.T. or its agents.

7.3  If within six (6) months after having been notified of any alleged infringement, LICENSEE shall have been unsuccessful in persuading the alleged infringer to desist and shall not have brought and shall not be diligently prosecuting an infringement action, or if LICENSEE shall notify M.I.T. at any time prior thereto of its intention not to bring suit against any alleged infringer for FIELD OF USE A, then, and in those events only, M.I.T. shall have the right, but shall not be obligated, to prosecute at its own expense any infringement of the PATENT RIGHTS for FIELD OF USE A, and M.I.T. may, for such purposes, use the name of LICENSEE as a party plaintiff in any such suit, without expense to LICENSEE.  The total cost of any such infringement action commenced or defended solely by M.I.T. shall be borne by M.I.T., and M.I.T. shall keep any recovery or damages for past infringement derived therefrom.

7.4  In the event that LICENSEE shall undertake litigation for the enforcement of the PATENT RIGHTS under Paragraph 7.2, or the defense of the PATENT RIGHTS under Paragraph 7.5, LICENSEE may withhold up to Fifty Percent (50%) of the payments otherwise thereafter due M.I.T. under Article 4 hereunder and apply the same toward reimbursement of up to half of LICENSEE's expenses, including reasonable attorneys' fees, in connection therewith.  Any recovery of damages by LICENSEE for each such suit shall be applied first in satisfaction of any unreimbursed expenses and legal fees of LICENSEE relating to such suit, and next toward reimbursement of M.I.T. for any payments under Article 4 past due or withheld and applied pursuant to this Article 7.  The balance remaining from any such recovery shall be divided as follows, the compensatory damages will be split commensurate with each parties losses, and punitive damages will be split equally.

7.5 In the event that a declaratory judgment action alleging invalidity or noninfringement of any of the PATENT RIGHTS shall be brought against M.I.T. or LICENSEE, M.I.T., at its option, shall have the right, within twenty (20) days after commencement of such action, to take over the sole defense of the action at its own expense. If M.I.T shall not exercise this right, LICENSEE may take over the sole defense at LICENSEE's sole expense, subject to Paragraph 7.4.

7.6 In any infringement suit as either party may institute to enforce the PATENT RIGHTS pursuant to this Agreement or in the event of defense by either party pursuant to Paragraph 7.5, the other party hereto shall, at the request and expense of the party initiating or defending such suit, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

7.7 LICENSEE, during the EXCLUSIVE PERIOD, shall have the sole right in accordance with the terms and conditions herein to sublicense any alleged infringer in the TERRITORY for FIELD OF USE A for future use of the PATENT RIGHTS and M.I.T. shall not grant any license for such rights in such field during such period. Any fees as part of such a sublicense shall be treated per Article 4.

## 8 - PRODUCT LIABILITY

8.1 LICENSEE shall at all times during the term of this Agreement and thereafter, indemnify, defend and hold M.I.T., its trustees, directors, officers, employees and affiliates, harmless against all claims, proceedings, demands and liabilities of any kind whatsoever, including legal expenses and reasonable attorneys' fees, arising out of the death of or injury to any person or persons or out of any damage to property, resulting from the production, manufacture, sale, use, lease, consumption or advertisement of the LICENSED PRODUCT(s) and/or LICENSED PROCESS(es) or arising from any obligation of LICENSEE hereunder.

8.2 LICENSEE shall obtain and carry in full force and effect commercial general liability insurance, including product liability and errors and omissions insurance which shall protect LICENSEE and M.I.T. with respect to events covered by Section 8.1 above. Such insurance shall be issued by an insurer pre-approved by M.I.T., such approval not to be unreasonably withheld, shall list M.I.T. as an additional named insured thereunder, shall be endorsed to include product liability coverage, and shall require thirty (30) days written notice to be given to M.I.T. prior to any cancellation or material change thereof. The limits of such insurance shall not be less than One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for bodily injury including death; One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for property damage; and One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for

errors and omissions. In the alternative, LICENSEE may self-insure subject to prior approval of M.I.T. LICENSEE shall provide M.I.T. with Certificates of Insurance evidencing compliance with this Section. LICENSEE shall continue to maintain such insurance or self-insurance after the expiration or termination of this Agreement during any period in which LICENSEE or sublicensee continues (i) to make, use, or sell a product that was a LICENSED PRODUCT under this Agreement or (ii) to perform a service that was a LICENSED PROCESS under this Agreement, and thereafter for a period of five (5) years.

8.3 EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, M.I.T., ITS TRUSTEES, DIRECTORS, OFFICERS, EMPLOYEES, AND AFFILIATES MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OF PATENT RIGHTS CLAIMS, ISSUED OR PENDING, AND THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED AS A REPRESENTATION MADE OR WARRANTY GIVEN BY M.I.T. THAT THE PRACTICE BY LICENSEE OF THE LICENSE GRANTED HEREUNDER SHALL NOT INFRINGE THE PATENT RIGHTS OF ANY THIRD PARTY. IN NO EVENT SHALL M.I.T., ITS TRUSTEES, DIRECTORS, OFFICERS, EMPLOYEES AND AFFILIATES BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING ECONOMIC DAMAGE OR INJURY TO PROPERTY AND LOST PROFITS, REGARDLESS OF WHETHER M.I.T. SHALL BE ADVISED, SHALL HAVE OTHER REASON TO KNOW, OR IN FACT SHALL KNOW OF THE POSSIBILITY OF THE FOREGOING.

## 9 - EXPORT CONTROLS

LICENSEE acknowledges that it is subject to United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes and other commodities (including the Arms Export Control Act, as amended and the United States Department of Commerce Export Administration Regulations). The transfer of such items may require a license from the cognizant agency of the United States Government and/or written assurances by LICENSEE that LICENSEE shall not export data or commodities to certain foreign countries without prior approval of such agency. M.I.T. neither represents that a license shall not be required nor that, if required, it shall be issued.

## 10 - NON-USE OF NAMES

Neither M.I.T., nor LICENSEE shall use the names or trademarks of the other party, nor any adaptation thereof, nor the names of any of their employees, in any advertising, promotional or

sales literature without prior written consent obtained from M.I.T. or LICENSEE, as appropriate, or said employee, in each case, except that LICENSEE may state that it is licensed by M.I.T. under one or more of the patents and/or applications comprising the PATENT RIGHTS.

## 11 - ASSIGNMENT

This Agreement is not assignable and any attempt to do so shall be void; provided, however, with the prior written consent of M.I.T, which shall not be unreasonably withheld, LICENSEE may assign this Agreement in connection with the sale or transfer of all or substantially all of LICENSEE's equity and assets to which this Agreement pertains, by merger, consolidation or otherwise, so long as the assignee shall agree in writing to be bound by the terms and conditions hereof prior to such assignment. Failure of such assignee to so agree shall be grounds for termination by M.I.T. under Paragraph 13.3.

## 12 - DISPUTE RESOLUTION

12.1  The parties agree that any dispute arising out of or relating to this Agreement shall be resolved solely by means of the procedures set forth in this Article, and that such procedures constitute legally binding obligations that are an essential provision of this Agreement; provided, however, that all procedures and deadlines specified in this Article may be modified by written agreement of the parties. If either party fails to observe the procedures of this Article, as may be modified by their written agreement, the other party may bring an action for specific performance of these procedures in any court of competent jurisdiction.

12.2    (a)  In the event of any dispute arising out of or relating to this Agreement, the affected party shall notify the other party, and the parties shall attempt in good faith to resolve the matter within ten (10) days after the date of such notice (the "Notice Date"). Any disputes not resolved by good faith discussions shall be referred to the Director or Assistant Director of the Technology Licensing Office for M.I.T. and to a senior executive for the LICENSEE (collectively, the "Executives"), who shall meet at a mutually acceptable time and location within thirty (30) days after the Notice Date and attempt to negotiate a settlement.

(b)  If the matter remains unresolved within sixty (60) days after the Notice Date, or if the Executives fail to meet within thirty (30) days after the Notice Date, either party may initiate mediation upon written notice to the other party, whereupon both parties shall be obligated to engage in a mediation proceeding under the then current Center for Public Resources ("CPR") Model Procedure for Mediation of Business Disputes, except that specific provisions of this Article shall override inconsistent provisions of the CPR Model Procedure. The mediator will be selected from the CPR Panels of Neutrals. If the parties cannot agree upon the selection of a mediator within ninety (90) days after the Notice Date, then upon the request of either party, the CPR shall

appoint the mediator. The parties shall attempt to resolve the dispute through mediation until one of the following occurs: (i) the parties reach a written settlement; (ii) the mediator notifies the parties in writing that they have reached an impasse; (iii) the parties agree in writing that they have reached an impasse; or (iv) the parties have not reached a settlement within one hundred and twenty (120) days after the Notice Date.

(c) If the parties fail to resolve the dispute through mediation, or if neither party elects to initiate mediation, each party shall have the right to pursue any other remedies legally available to resolve the dispute, provided, however, that the parties expressly waive any right to a jury trial in any legal proceeding under this Article 12.

12.3. (a) Each party shall continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of or relating to this Agreement; provided, however, that a party may suspend performance of its obligations during any period in which the other party fails or refuses to perform its obligations. Nothing in this Article is intended to relieve LICENSEE from its obligation to make payments pursuant to Articles 4 and 6 of this Agreement.

(b) Although the procedures specified in this Article 12 are the sole and exclusive procedures for the resolution of disputes arising out of or relating to this Agreement, either party may seek a preliminary injunction or other provisional equitable relief if, in its reasonable judgment, such action is necessary to avoid irreparable harm to itself or to preserve its rights under this Agreement.

(c) The parties agree that all applicable statutes of limitation and time-based defenses (such as estoppel and laches) shall be tolled while the procedures set forth in Sections 12.2(a) and 12.2(b) are pending. The parties shall cooperate in taking any actions necessary to effectuate this result.

## 13 - TERMINATION

13.1 If LICENSEE shall cease to carry on its business, this Agreement shall terminate upon notice by M.I.T.

13.2 Should LICENSEE fail to make any payment whatsoever due and payable to M.I.T. hereunder, M.I.T. shall have the right to terminate this Agreement effective on thirty (30) days' notice, unless LICENSEE shall make all such payments to M.I.T. within said thirty (30) day period. Upon the expiration of the thirty (30) day period, if LICENSEE shall not have made all such payments to M.I.T., the rights, privileges and license granted hereunder shall automatically terminate.

13.3 Upon any material breach or default of this Agreement by LICENSEE (including, but not limited to, breach or default under Paragraph 3.3), other than those occurrences set out in Paragraphs 13.1 and 13.2 hereinabove, which shall always take precedence in that order over any

material breach or default referred to in this Paragraph 13.3, M.I.T. shall have the right to terminate this Agreement and the rights, privileges and license granted hereunder effective on ninety (90) days' notice to LICENSEE. Such termination shall become automatically effective unless LICENSEE shall have cured any such material breach or default prior to the expiration of the ninety (90) day period.

13.4 LICENSEE shall have the right to terminate this Agreement at any time on six (6) months' notice to M.I.T., and upon payment of all amounts due M.I.T. through the effective date of the termination.

13.5 Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination; and Articles 1, 4.1 (e), 4.1 (f), 8, 9, 10, 12, 13.5, 13.6, and 15 shall survive any such termination. LICENSEE and any sublicensee thereof may, however, after the effective date of such termination, sell all LICENSED PRODUCTS, and complete LICENSED PRODUCTS in the process of manufacture at the time of such termination and sell the same, provided that LICENSEE shall make the payments to M.I.T. as required by Article 4 of this Agreement and shall submit the reports required by Article 5 hereof.

13.6 Upon termination of this Agreement for any reason, any sublicensee not then in default shall have the right to seek a license from M.I.T. M.I.T. agrees to negotiate such licenses in good faith under reasonable terms and conditions.

## 14 - PAYMENTS, NOTICES AND OTHER COMMUNICATIONS

Any payments, notice or other communication pursuant to this Agreement shall be sufficiently made or given on the date of mailing if sent to such party by certified first class mail, return receipt requested, postage prepaid, addressed to it at its address below or as it shall designate by written notice given to the other party:

      In the case of M.I.T.:

      Director
      Technology Licensing Office
      Massachusetts Institute of Technology
      77 Massachusetts Avenue, Room NE25-230
      Cambridge, Massachusetts 02139

      In the case of LICENSEE:

      Vice President, Business Development
      CuraGen Corporation
      555 Longwharf Drive, 11th Floor
      New Haven, Connecticut 06511

## 15 - MISCELLANEOUS PROVISIONS

15.1  All disputes arising out of or related to this Agreement, or the performance, enforcement, breach or termination hereof, and any remedies relating thereto, shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts, U.S.A., except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent shall have been granted.

15.2  The parties hereto acknowledge that this Agreement sets forth the entire Agreement and understanding of the parties hereto as to the subject matter hereof, and shall not be subject to any change or modification except by the execution of a written instrument signed by the parties.

15.3  The provisions of this Agreement are severable, and in the event that any provisions of this Agreement shall be determined to be invalid or unenforceable under any controlling body of the law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.

15.4  LICENSEE agrees to mark the LICENSED PRODUCTS sold in the United States with all applicable United States patent numbers. All LICENSED PRODUCTS shipped to or sold in other countries shall be marked in such a manner as to conform with the patent laws and practice of the country of manufacture or sale.

15.5  The failure of either party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other party.

IN WITNESS WHEREOF, the parties have duly executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

By _____

Name _____
LITA L. NELSEN, DIRECTOR

Title _____
TECHNOLOGY LICENSING OFFICE

Date _____

CURAGEN CORPORATION

By _____

Name  Jonathan  M.  Rothberg

Title  C E O

Date  November 12, 1997

-15-

APPENDIX A

PATENT RIGHTS on the EFFECTIVE DATE

UNITED STATES PATENT RIGHTS

M.I.T. Case No. 7205
Yeast Three-Hybrid System
U.S.S.N. 08/845674
By Jun Liu and Edward Licitra
Filed on April 25, 1997

FOREIGN PATENT RIGHTS

M.I.T. Case No. 7205
Yeast Three-Hybrid System
PCT U.S.S.N. 97/06912
By Jun Liu and Edward Licitra
Filed on April 25, 1997

APPENDIX B

DESIGNATED FOREIGN COUNTRIES

Foreign countries in which PATENT RIGHTS shall be filed, prosecuted and maintained in accordance with Article 6:

For M.I.T. Case No. 7205:

TO BE DETERMINED

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Massachusetts Institute of Technology

## DEFENDANTS
CuraGen Corporation

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Mark DiVincenzo and Richelle Nessralla
Massachusetts Institute of Technology
77 Massachusetts Avenue, Building 12-090
Cambridge, MA 02139 (617) 452-5943

ATTORNEYS (IF KNOWN)

05 - 10860 WGY

## II. BASIS OF JURISDICTION    (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT    (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION    (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Diversity proceeding under 28 U.S.C. 1332(a) for collection of fees and interest due under a patent license agreement between the parties

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $ at least
$155,350.19

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ YES    ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY
JUDGE _____    DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Massachusetts Institute of Technology

## DEFENDANTS

CuraGen Corporation

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Mark DiVincenzo and Richelle Nessralla
Massachusetts Institute of Technology
77 Massachusetts Avenue, Building 12-090
Cambridge, MA 02139 (617) 452-5943

ATTORNEYS (IF KNOWN)

05-108

## I. BASIS OF JURISDICTION     (PLACE AN "X" IN ONE BOX ONLY)

☐1 U.S. Government Plaintiff

☐3 Federal Question
(U.S. Government Not a Party)

☐2 U.S. Government Defendant

☒4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business In This State | ☒4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☒5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. ORIGIN     (PLACE AN "X" IN ONE BOX ONLY)

☒ Original Proceeding

☐2 Removed from State Court

☐3 Remanded from Appellate Court

☐4 Reinstated or Reopened

☐5 Transferred from another district (specify)

☐6 Multidistrict Litigation

☐7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT     (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 42 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Diversity proceeding under 28 U.S.C. 1332(a) for collection of fees and interest due under a patent license agreement between the parties

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**
at least
$155,350.19

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE
4·27·05

SIGNATURE OF ATTORNEY OF RECORD
Richelle Ne___

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____